IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ACADIAN STEEL, INC., | Case No. 21-cv-131-DKW-KJM |
|       Plaintiff/Counterclaim Defendant, | **ORDER (1) GRANTING DEFENDANT/THIRD-PARTY PLAINTIFF'S MOTION FOR** |
|     vs. | **SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIM AGAINST PLAINTIFF AND** |
| AMERICAN CONTRACTORS INDEMNITY COMPANY, | **THIRD-PARTY DEFENDANTS AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY** |
|       Defendant/Counterclaim Plaintiff. | **JUDGMENT** |
| AMERICAN CONTRACTORS INDEMNITY COMPANY, | |
|       Defendant/Counterclaim Plaintiff/Third-Party Plaintiff, | |
|     vs. | |
| JARVAN PIPER, COLETTE PIPER, AND ACADIAN STEEL ERECTORS, INC., | |
|       Third-Party Defendants. | |

In this indemnification dispute, surety American Contractors Indemnity

Company ("ACIC") claims subcontractor Acadian Steel, Inc. ("Acadian")

breached the parties' indemnity contracts by failing to reimburse ACIC for a surety

bond payment made to general contractor Nan, Inc.[1]  Acadian disclaims its indemnity obligation because it alleges that ACIC made the bond payment in bad faith and after it had any legal obligation to do so.  The parties now cross-move for summary judgment—ACIC for breach of contract, and Acadian for declaratory judgment releasing it from liability.[2]

The Court GRANTS ACIC's motion because there is no genuine dispute of material fact that Acadian failed to indemnify ACIC, and, under the contract, Acadian forfeited the right to assert a bad faith defense by failing to post certain collateral with ACIC upon demand.  Moreover, while Acadian avers that the contract clause conditioning its bad faith defense on the deposit of collateral is unconscionable, it has not presented *any* probative evidence to that effect; indeed, such clauses are routinely enforced.  Thus, ACIC is entitled to summary judgment on its breach of contract claim, and Acadian's cross-motion is DENIED.

## LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), a court must grant a motion for summary judgment when, considering the record in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is

---

[1]Third-Party Defendants Jarvan Piper (Acadian's president), Colette Piper (Jarvan's spouse) and Acadian Steel Erectors, Inc. (an affiliate of Acadian) are co-indemnitors with Acadian in the pertinent indemnity contract.  Dkt. No. 62-6; Declaration of Jarvan Piper ("Jarvan Decl.") ¶ 16, Dkt. No. 62-1.  In this Order, "Acadian" encompasses all four parties, unless otherwise stated.

[2]Although not technically cross-motions, having been filed simultaneously, the two motions here are complementary.  Granting one requires denying the other.

entitled to judgment as a matter of law." *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

On summary judgment, it is each party's responsibility to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of informing the court of the basis for its motion, identifying the portion of the record "it believes demonstrate[s] the absence of a genuine issue of material fact," and "affirmatively demonstrat[ing] that no reasonable trier of fact could find for other than the moving party" on any of the elements essential to its case. *Id.*; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Then, the burden shifts to the non-movant to present significant, probative evidence demonstrating the existence of a triable issue of fact as to the movant's claim or any affirmative defense that it may have. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Soremekun*, 509 F.3d at 984.

"There is no express or implied requirement in Rule 56 that the moving party support its motion with . . . materials *negating* the opponent's claim" or defense. *Celotex*, 477 U.S. at 322–23. Rather, after carrying its own burden, the movant can prevail on summary judgment merely by pointing out the absence of evidence to support the non-moving party's case. *Id.*

## RELEVANT UNDISPUTED MATERIAL FACTS AND PROCEDURAL BACKGROUND

### I.     The Three Surety Contracts

In 2015, the Honolulu Authority for Rapid Transportation ("HART") hired Nan, Inc., a general contractor, to build the Kamehameha Highway rail stations for the Honolulu rail project.  *See* Dkt. No. 62-5 at 2.  In March 2017, Nan, in turn, retained Acadian, a South Carolina-based subcontractor, to supply fabricated steel for the rail station project.  Plaintiff's Concise Statement of Facts (PCSF) ¶ 1, Dkt. No. 62; Defendant's Concise Statement of Facts (DCSF) ¶ 12, Dkt. No. 61; Plaintiff's Concise Statement of Facts in Opposition (PCSFO) ¶ 12, Dkt. No. 79; PCSF Ex. B ("Subcontract"), Dkt. No. 62-4.[3]  As a condition of retention, Nan required Acadian to procure a surety bond.  Subcontract ¶ 5; Declaration of Jarvan Piper ("Jarvan Decl.") ¶ 10, Dkt. No. 62-1.

A surety bond is a tripartite arrangement by which a surety company insures a general contractor—also known as the "obligee"—against default by a subcontractor—also called the "principal"—on the underlying subcontract.  The principal binds itself to the obligee for an agreed-upon penal sum, subject to its own performance on the underlying contract, and the surety assumes liability for

---

[3]The original purchase order between Nan and Acadian was dated March 9, 2017.  Acadian promptly began work on the purchase order even though the Subcontract was not finalized until May 9, 2017.  *See* PCSFO ¶ 12; Declaration of Jarvan Piper ("Jarvan Decl.") ¶¶ 7–8, 10–11, Dkt. No. 62-1.

the principal's default.  This arrangement reassures the obligee that, if the principal

defaults on the underlying contract, the obligee may seek redress without having to

pursue a claim against the principal directly.  As partial consideration for the bond,

the principal typically agrees to indemnify the surety against any bond payment.

Here, Acadian agrees that it could not qualify for a traditional bond due to a

lack of capital.  As a result, in order to pursue the subcontract with Nan and meet

Nan's bonding requirements, Acadian contacted ACIC, a surety that provides

bonds to smaller companies through the federal Small Business Administration

("SBA") bond guarantee program.  *See* PCSF ¶ 2; Dkt. Nos. 60-1 at 3, 78 at 7–8,

13; Jarvan Decl. ¶¶ 4, 12.  Acadian and ACIC entered into two surety contracts in

June and July 2017: the Subcontract Performance Bond ("Bond"), PCSF Ex. C,

Dkt. No. 62-5, and the General Indemnity Agreement ("GIA"), PCSF Ex. D, Dkt.

No. 62-6.[4]

Operating in tandem, these contracts provided that upon an "event of

default," ACIC would become liable to Nan for the reasonable cost of completing

performance on the Subcontract, less the balance of the Subcontract price, up to the

penal sum of $5,654,330.00.  PCSF ¶ 2; DCSF ¶ 13.  Any such "event" would also

---

[4]The GIA was dated June 21, 2017, and the Bond was dated July 3, 2017.  DCSF ¶¶ 5, 13. Plaintiff and the three Third-Party Defendants are, collectively, parties to the GIA.  Jarvan Piper signed the GIA on behalf of Acadian Steel, Inc., Acadian Steel Erectors, Inc., and himself, and Colette signed on her own behalf.  Dkt. No. 61-6 at 11.  Jarvan signed the Bond on behalf of Acadian Steel, Inc.  Dkt. No. 61-5 at 5.

trigger an obligation by Acadian to, upon demand by ACIC, "immediately deposit with [ACIC] collateral in any amount, value or form as [ACIC] may designate in its sole and absolute discretion."  GIA § X(A).  The GIA designated twenty-one possible "Event[s] of Default," one of which was "[t]he declaration by [Nan] . . . that [Acadian wa]s in default under [the Subc]ontract, irrespective of whether or not [Acadian wa]s actually in default."  *Id.* § I(D)(4); *see also* Bond at 2–3 (providing for execution of the Bond "[w]henever [Acadian] shall be, and be properly declared by [Nan] to be, in default under the Subcontract and [Nan] has terminated the Subcontract").

Following any payment on the Bond by ACIC, Acadian would then become liable to "exonerate, indemnify, reimburse, and save and hold [ACIC] harmless from and against" any such payment made in the good faith belief that either: "(1) [Acadian was] in default under [the GIA]; (2) [ACIC] was or might be liable for a claim asserted against [the] Bond, whether or not such liability actually existed; or (3) such payments were . . . necessary or expedient to protect [ACIC]'s rights or interests or to avoid or lessen [ACIC]'s actual or alleged liability."  *Id.* § III.  ACIC possessed the "sole and absolute discretion" to settle any Bond claim.  *Id.* § VIII.

The GIA provided that, "[i]n the event of any payment by ACIC," proof of that payment would be *prima facie* evidence of the payment and, "in the absence of

actual fraud," would be "final, conclusive, and binding" on the principal in any later claim or suit by ACIC.  *Id.* § IX.

The Bond provided for a twenty-five month limitations period: "No suit shall be filed on this bond after twenty-five (25) months from the date of which the Subcontract is substantially completed, terminated or abandoned, whichever is first to occur . . . ."  Bond at 2.

Although the GIA afforded substantial discretion to ACIC, Acadian was not without power to dispute or challenge a Bond claim by Nan.  For instance, Acadian could ask ACIC to "consider . . . defending, compromising, litigating, protesting, or appealing, any" Bond claim by complying with Subsections A and B of Section VIII of the GIA: by (A) giving written notice of its request and (B) simultaneously depositing collateral in a "form and amount acceptable to [ACIC] in its sole and absolute discretion."[5]  Alternatively, Acadian could arbitrate a claim of wrongful

---

[5] Subsections A and B of Section VIII of the GIA read, in their entirety:

> (A) Give written notice to the Surety to [that] effect by certified or registered mail; and

> (B) Simultaneously therewith, deposit with the Surety cash, securities, or other collateral, in form and amount acceptable to the Surety in its sole and absolute discretion, to completely cover the Surety's exposure or perceived exposure to any loss, cost or expense for which the Surety is entitled to exoneration, indemnification, or reimbursement pursuant to this Agreement.  The Surety shall be entitled to utilize counsel of its own choice in prosecuting, defending, resisting, litigating or appealing any such claim, demand, suit, award, or judgment, or in appealing from any judgment, award or assessment, whether or not any Principal or Indemnitor also provides its own counsel, and all associated costs and expenses shall be recoverable by the Surety pursuant to this Agreement.

termination against Nan directly. *See* Subcontract ¶ 28 (mandating binding arbitration of any claim between Nan and Acadian within six months, failing which, the claim would be "forever bar[red]").

Finally, the GIA provided that Acadian's performance of Subsections A and B of Section VIII, to include the collateral deposit, was "an absolute condition precedent to [Acadian's right] to challenge [ACIC]'s good faith with respect to settlement of any claims asserted against [ACIC]." GIA § VIII.

## II.  Acadian's Termination

On September 27, 2018, after Acadian had worked on the rail project for approximately eighteen months, Nan sent a letter demanding that Acadian cure certain defaults under the Subcontract. *See* DCSF ¶ 16; Dkt. No. 7-1 ¶ 13. Two weeks later, on October 10, 2018, also by letter, Nan terminated Acadian from the Subcontract for failure to cure said defaults. DCSF ¶ 14; PCSFO ¶ 14. ACIC received a copy of both letters. *See* PCSF ¶ 4.

On October 10, 2018, the same day as its termination, Acadian responded to Nan by letter, denying it had defaulted: "Acadian does not consider itself at a state of default[,] as it continues to work diligently to supply all materials as per the [Subcontract]," and claiming that any defaults were caused by design failures by Nan. PCSF Ex. F, Dkt. No. 62-8.

### III.   Nan's Bond Claim and the Instant Litigation

On October 11, 2018, Nan made a claim on the Bond by sending ACIC a Notice of Bond Claim letter and attaching a copy of the Subcontract.  DCSF ¶ 15; PCSFO ¶ 15.  On December 19, 2018, ACIC sent a Collateral Demand Letter to Acadian, demanding indemnification and the posting of collateral in the amount of the penal sum, $5,654,330.00.  DCSF ¶ 17; PCSFO ¶ 17.  Acadian did not respond and did not post, or offer to post, any collateral.  DCSF ¶ 18; PCSFO ¶ 18.

Over the course of the next thirty-one months, ACIC investigated the value of Nan's Bond claim, regularly requesting supporting information and documentation.  PCSF ¶ 5; DCSF ¶¶ 16, 20–21.  During that investigation, on January 30, 2019, ACIC and Nan executed a Memorandum of Understanding ("MOU") that stated, "ACIC is investigating the [Bond] claim and exploring alternatives to resolve the claim and remedy the default."  PCSF Ex. G ("MOU") ¶ 1.5, Dkt. No. 62-9; DCSF ¶ 19.  The MOU also stated that "the terms and conditions of [the Bond] remain[ed] in full force and effect," and specified that ACIC and Nan "reserve[d] all their rights under said Bond and all contract documents and the law."  MOU ¶ 2.4.

It is undisputed that ACIC and Nan did not enter into a written agreement tolling the twenty-five month suit limitations period.  *See* PCSF ¶ 7; DCSF ¶ 22;

Dkt. No. 85 at 3.  It is also undisputed that the limitations period began on October 10, 2018, the date Acadian was terminated.  *See* Dkt. Nos. 78 at 9, 85 at 3.[6]

On October 7, 2020, Nan made a claim against the Bond for $7,412,301.92. DCSF ¶ 21.  On December 22, 2020, ACIC sent a second Collateral Demand Letter to Acadian, again demanding indemnification and collateral in the amount of the penal sum, $5,654,330.00.  DCSF ¶ 23; PCSFO ¶ 23.  And again, Acadian failed to post, or offer to post, collateral in any amount.  DCSF ¶ 24; PCSFO ¶ 24.

On February 22, 2021, Acadian notified ACIC of Acadian's position that the twenty-five month suit limitations period had expired on or about November 10, 2020, and that Nan's Bond claim was thus barred.  Complaint ¶ 28, Dkt. No. 1; Answer ¶ 22, Dkt. No. 7.  Acadian's letter further suggested that ACIC deny Nan's claim and utilize the suit limitations period to defeat ACIC's own liability. Complaint ¶ 28; Answer ¶ 22.

On March 12, 2021, Acadian filed an action in this Court requesting declaratory judgments that Nan's Bond claim was time-barred "as to Acadian," and that Acadian was "released and discharged from any and all obligations and liabilities arising under" the Bond.  Complaint ¶¶ 31, 33.  On March 30, 2021, Acadian advised ACIC that it would not indemnify any payment on the Bond:

---

[6]In its Reply Brief, Acadian states, seemingly inadvertently, that the suit limitations period ended in November 2019.  Dkt. No. 84 at 8 n.3.  Having admitted that the twenty-five month suit limitations period began in October 2018 upon Acadian's termination, Dkt. No. 78 at 9, the period could have run no earlier than November *2020*.

> If ACIC pays Nan any monies . . . , we do not believe it would be in good faith and therefore any such payment would not be recoverable from Acadian.  For the same reasons, we also do not believe any such payment would or should be subject to reimbursement in any amount under an SBA guarantee.  Any attempt by ACIC to recover such funds from the SBA based upon the false premise that Nan is entitled to payment on an expired performance bond, procured upon an existing contract that was clearly under stress when Nan first demanded the bond from Acadian, would certainly be subject to challenge.

PCSF Ex. I at 4, Dkt. No. 62-11.

On April 1, 2021, ACIC and Nan reached a settlement agreement calling for payment on the Bond of $4,075,450.73.  DCSF ¶ 28; PCSFO ¶ 28.  On April 5, 2021, ACIC tendered a check to Nan in that amount.  DCSF ¶ 29; PCSFO ¶ 29.  Acadian has since refused to indemnify and/or reimburse ACIC for the Bond payment or any costs or fees relating to that payment.  DCSF ¶ 31; PCSFO ¶ 31.

On May 3, 2021, ACIC answered Acadian's Complaint and asserted a counterclaim for, *inter alia*, Breach of Contract for Acadian's failure to indemnify ACIC for the Bond payment.[7]  Dkt. No. 7; Dkt. No. 7-1 at ¶¶ 32–34.

## IV.   The Instant Motions for Summary Judgment

On February 28, 2022, each party filed a motion for summary judgment: Acadian on its Declaratory Judgment claims, and ACIC on its Breach of Contract claim.  Dkt. Nos. 59, 60.  ACIC contends that Acadian breached the GIA by failing

---

[7]ACIC also filed a Third-Party Complaint against the Third-Party Defendants, asserting the same causes of action.  Dkt. No. 8.

to comply with its indemnity obligations.  Acadian claims it should be excused from those obligations because ACIC paid the Bond in bad faith, both by paying after the suit limitations period had expired and by failing to investigate the circumstances of Acadian's default.  Acadian also accuses ACIC of possessing generally insincere motives for paying the Bond due to its status as an SBA-backed surety.  These claims, along with ACIC's responses, are described in detail below.

A.    Suit Limitations Period

Acadian claims that the Bond's twenty-five month suit limitations period expired on November 10, 2020.  As a result, ACIC's decision to pay Nan on April 5, 2021, "despite having no legal basis for doing so," was voluntary and without recourse under the GIA.  Dkt. No. 60-1 at 13; PCSF ¶¶ 7–8; DCSFO ¶¶ 7–8 (showing there was no written tolling agreement and while Nan had made claims on the Bond within the limitations period, it never filed suit).  Acadian reasons, "ACIC could not reasonably and in good faith elect to make payment to Nan when . . . Nan was not able to bring suit."  *Id.* at 14; Dkt. No. 78 at 18 ("Normally, a payment made with knowledge that the Statute of Limitations has run would not be under sufficient coercion to entitle the payor to restitution.") (quoting Restatement (First) of Security § 108(5)(f) (Am. Law Inst. 1941)).

In response, ACIC asserts that, despite the absence of a written tolling agreement, the limitations period had *not* expired but rather was equitably tolled.

Equitable tolling is a doctrine under which statutory or contractual limitations periods may be tolled based on the parties' conduct and expectations, rather than on express agreements. *See* Dkt. No. 80 at 8–9 (citing Hawai'i cases that apply the doctrine in various contexts).

ACIC claims "it was obvious" to ACIC and Nan that the period here was equitably tolled pending the completion of ACIC's investigation into the value of Nan's claim and the companies' ongoing negotiations. DCSF ¶ 22. Key representatives from both Nan and ACIC agree that was their understanding. *See* Declaration of Sirarpi Arpi Mnatsakanyan ("Sirarpi Decl.") ¶ 17, Dkt. No. 61-1; Declaration of Micah Aiu ¶¶ 6–13, Dkt. No. 61-13 ("ACIC made it abundantly clear to Nan that it . . . would be paying the Bond claim, with the only issue being the amount it would pay."). In fact, on January 30, 2019, ACIC and Nan agreed, in writing, "ACIC is investigating the claim and exploring alternatives to resolve the claim and remedy the default." MOU ¶ 1.5.

ACIC also contends that its conduct would have had the *legal* effect of tolling the period, despite the absence of a written agreement. ACIC explains,

> Had ACIC, upon the expiration of th[e] limitations period, attempted to play "gotcha" by denying Nan's claim after lulling it into a false sense of security for two years, no court in this (or any) jurisdiction would have allowed it to assert the limitations period in its own defense, and any such court would likely admonish ACIC for playing so fast and loose.

Dkt. No. 85 at 4–5.  ACIC thus characterizes Acadian's claim as "asking this Court to find that ACIC owed it an obligation of good faith to act in extraordinarily bad faith towards Nan," essentially "cheat[ing] the obligee at the behest of the principal."  Dkt. No. 80 at 1, 11–12.[8]

B.    Adequacy of ACIC's Investigation

Acadian maintains that ACIC's failure to investigate the circumstances surrounding Acadian's termination from the job impugns ACIC's good faith.  *See* Dkt. No. 85 at 6 ("The adequacy of a surety's investigation is one of the most important factors in considering if the surety acted in good faith.") (citing *Liberty Mut. Ins. Co. v. Hawaiya Techs., Inc.*, 2020 WL 1434254 at *6 (D. Haw. Mar. 24, 2020)).  Specifically, Acadian suggests that Nan was to blame for project delays and that Nan was delinquent on payments to Acadian for work performed prior to Subcontract termination.[9]  Acadian argues that ACIC "elected to ignore its and Acadian's substantive defenses to Nan's claims."  Dkt. No. 78 at 3–4.

In response, ACIC contends this argument reflects a fatal misunderstanding of how the tripartite surety relationship works.  ACIC itself *had* no substantive

---

[8]ACIC also points out that Acadian seems to have been pinning its hopes on the off-chance that ACIC and Nan would complete their negotiations after the suit period ended.  If ACIC had resolved the Bond claim a few months earlier, Acadian would have lost its primary argument. *See* Dkt. No. 80 at 11.

[9]Acadian claims to have "served a notice of claim against Nan's bond surety Fidelity and Deposit Company of Maryland and Zurich American Insurance Company" for the amount of $2,497,289.41 for monies owed but never "complete[d] its legal action against Nan" due to Jarvan Piper's health issues.  Complaint ¶¶ 15–16; Dkt. No. 60-1 at 6.

claims against Nan.  ACIC's only obligation as surety was to investigate the value of Nan's Bond claim and settle that claim in good faith.  Dkt. No. 59 at 21.  In contrast, Acadian had a right to bring its *own* claims against Nan via arbitration within six months but did not do so.  *See* Subcontract ¶ 28.  Moreover, ACIC might have investigated Acadian's position if such investigation had been specifically requested in writing (and backed up by collateral security), but that request (and posting) was never made.[10]  *See* GIA § VIII(A)–(B); Dkt. No. 80 at 13 ("ACIC is simply not obligated to defend Acadian's position without collateral.").

## C.   ACIC's Status as an SBA-Backed Surety Company

Finally, Acadian alleges that ACIC possessed bad faith intentions to pay the Bond because it knew it would be reimbursed for 90% of any payment by the SBA bond guarantee program.  *See, e.g.*, Dkt. No. 60-1 at 16 n.2 ("There appears to be only one logical reason for ACIC's insistence on paying Nan off despite the expired bond and claim period, and that is that ACIC was assured of receiving

---

[10]Similarly, throughout briefing and oral argument, Acadian repeatedly complains that Nan never brought a claim against *Acadian*, such that Acadian could defend itself.  *See, e.g.*, Dkt. No. 60-1 at 6 ("[A]t no time did Acadian either waive any such claims or admit liability in any breach of contract claim filed by Nan—a claim that was never brought.  Acadian waited for Nan to take action on its threated [*sic*] breach of contract claims – either in a bond or contract action.").  Here, again, ACIC points out that Acadian seems to have been operating under a misapprehension about the tripartite surety relationship.  Nan's legal avenue upon default was through a Bond claim against ACIC—the path it took.  Having received a remedy, it had no obligation or reason to sue anyone.  By contrast, it was *Acadian's* obligation to pursue any affirmative claim it may have had against Nan, either through arbitration or by enlisting ACIC's help by complying with Subsections A and B of Section VIII of the GIA.

nearly full reimbursement from the SBA for such payment.").  In support of this claim, Acadian alleges that ACIC has often been reimbursed by the SBA:

> It is laughable to read ACIC's Motion describing ACIC's trials and tribulations in expending "millions" of dollars to service Nan's claims, when in fact, even the very limited public information Acadian has been able to recover to date reveals that from July 2018, ACIC was handing every one of its bills over to the SBA to be paid by the U.S. taxpayers.  It had no interest in a good faith investigation . . . because it knew the U.S. taxpayers would foot its bills.  In fact, by the time ACIC paid Nan off, it had received so much "default" money from the SBA that it had a vested interest in perpetuating Acadian's alleged default.  In doing so, ACIC effected great harm and seeks to cause even greater harm to the very company that was supposed to benefit from the SBA program allowing this bond in the first place. . . .  This was not only a flagrant abuse of a program designed to assist, not harm, entities such as Acadian, it was bad faith . . . .

Dkt. No. 78 at 4–6.

In response, ACIC points out the apparent irrationality of this allegation. "Either way, ACIC still bears the loss of the remaining ten percent (10%)."  Dkt. No. 85 at 14.  It makes little sense for ACIC to have a "vested interest" in perpetuating a scheme in which it earns ninety cents for every dollar it spends.[11]

This matter has been fully briefed, *see* Dkt. Nos. 59–62, 78–81, 84–87, and the Court heard oral argument on May 13, 2022.  *See* Dkt. No. 89.  The Court has carefully considered the parties' arguments, and this Order follows.

---

[11]Acadian requests that the Motions before the Court be stayed pending discovery of SBA-related documents from ACIC.  Dkt. No. 78 at 5–6.  Since the Court decides the Motions without the need to address the merits of Acadian's SBA arguments, such discovery is not relevant and provides no basis for a stay.

## DISCUSSION

### I.    ACIC has carried its burden of showing the absence of a genuine issue of material fact that Acadian is in breach of the surety contracts.

To prevail on a breach of contract claim, a plaintiff must show: (1) there is a valid contract between the parties; (2) the plaintiff performed under that contract; (3) the defendant failed to perform a particular provision of the contract; and (4) such failure proximately caused the plaintiff's reasonably foreseeable injury.  *See Calipjo v. Purdy*, 439 P.3d 218, 225 (Haw. 2019).

Here, there is no genuine dispute of material fact as to any of these elements. *First*, it is undisputed that the three pertinent contracts are valid.  *See generally* Dkt. Nos. 60, 78, 84 (taking the Subcontract, Bond, and GIA as valid contracts throughout Acadian's briefs).[12]

*Second*, there is no genuine dispute that ACIC performed its duties under the surety contracts, while Acadian did not.  Upon a declaration by Nan of default and termination of Acadian on October 10, 2018, ACIC was obligated to execute the

---

[12]Despite Acadian's desultory complaints about Nan's behavior during contract formation, *see, e.g.*, Dkt. No. 78 at 6–8; Jarvan Decl. ¶¶ 7, 10, 19 (lamenting problems with the March 2017 purchase order and various changes to the May 2017 Subcontract including the arbitration clause and bond requirement), Acadian never claims the contracts were invalid.  Nor does Acadian present facts that shed doubt on validity.  *See Calipjo*, 439 P.3d at 225 (three elements create a valid contract: capacity, offer and acceptance, and consideration).  Acadian executed the May 2017 Subcontract without complaint, complied with that contract's demands, including procuring the surety bond, and proceeded to work pursuant to that contract until being terminated in October 2018.  In fact, even after being terminated, Acadian insisted that it would still "work diligently to supply all materials" required by the Subcontract.  Dkt. No. 62-8.

Bond, and Acadian was obligated to indemnify ACIC against any losses that arose from such execution.  *See* Bond at 2; GIA § I.D.4 (defining as an event of default Nan's declaration of Acadian's default, "irrespective of whether or not such Principal [wa]s actually in default"); *ibid* § III (describing Acadian's indemnity obligations).

ACIC performed.  According to a sworn declaration from a Senior Bond Claims Attorney for ACIC, ACIC investigated its liability to Nan and ultimately paid $4,075,450.73 on the Bond claim.  Sirarpi Decl. ¶ 23.  This sworn declaration is "*prima facie* evidence of the fact and amount" of the payment, and is "final, conclusive, and binding upon [Acadian]," absent actual fraud.  *See* GIA § IX. Acadian has not disputed the payment, nor has it alleged fraud.

Acadian did not perform.  Aside from disputing the good faith of ACIC's payment, an argument it has forfeited, see *infra*, Section II, Acadian does not dispute the fact that it did not agree to indemnify or reimburse ACIC.  *See* PCSFO ¶ 31.

*Third*, ACIC has alleged damages that were reasonably foreseeable to Acadian at the outset.  Such damages consist of the $4,075,450.73 Bond payment, along with additional costs of $65,626.45 as set forth in an itemized Loss Report. Dkt. No. 61-12.  The Bond explicitly contemplated the penal sum of $5,654,330.00—more than what was ultimately paid—and the GIA provided that

ACIC would have the "sole and absolute discretion" to settle any Bond claim.  *See* Bond at 2; GIA § VIII.

In sum, ACIC has carried its burden of demonstrating that "no reasonable trier of fact could find for [Acadian]" on any of the elements essential to ACIC's breach of contract claim.  *See Soremekun*, 509 F.3d at 984.  The burden therefore shifts to Acadian to show a genuine issue for trial on any defense it may have.

## II.   The GIA imposed a condition precedent—the posting of collateral security—to Acadian's right to bring a "bad faith" defense.

Relying on Section III of the GIA, Acadian avers that ACIC paid the Bond in bad faith, excusing Acadian from its indemnity obligations.  *See* GIA § III (providing that Acadian had to indemnify ACIC for any Bond payment made in the good faith belief that (1) Acadian had defaulted under the GIA, (2) ACIC might be liable for the Bond claim, or (3) the payment would protect ACIC's interests or lessen its actual or alleged liability).

However, Section VIII of the GIA expressly precludes Acadian from bringing a bad faith defense without first posting collateral.  *See* GIA § VIII (providing that the deposit of collateral shall be "an absolute condition precedent" to Acadian's right "to challenge the Surety's good faith with respect to settlement of any claims asserted against the Surety"); *see also ibid.* § X(A) (obligating Acadian to immediately post collateral with ACIC upon the occurrence of any event of default in order to indemnify ACIC against potential losses).

Undeterred, Acadian contends that Section VIII does not preclude its bad faith defense.  First, Acadian asserts that, under Hawai'i principles of contract interpretation, when read together, Sections III and VIII of the GIA mean that "ACIC only has the right to indemnification if it pays in good faith."  Dkt. No. 84 at 9.  Second, in the alternative, Acadian asserts that the collateral requirement is unconscionable or adhesive.  Neither of these contentions has merit.

A.   <u>Contract Interpretation Principles</u>

Acadian first contends that GIA Sections III and VIII are inconsistent: Section III guarantees ACIC's good faith, while Section VIII removes Acadian's ability to enforce that guarantee.  Any inconsistency or ambiguity "must be interpreted against" the drafter—here, ACIC.  Dkt. No. 78 at 20–21 (citing *Luke v. Gentry Realty, Ltd.*, 96 P.3d 261, 269 (Haw. 2004)).

Acadian is simply wrong.  Sections III and VIII are not inconsistent.  Section VIII simply imposes a *limitation* on Acadian's ability to enforce ACIC's good faith—that is, by complying with its *own* obligations under Section X(A) and posting collateral to indemnify the surety against its losses.

Acadian next contends that the contract can be interpreted multiple ways, and that Hawai'i law requires the construction it urges:

> Where the language of a contract is susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such

> as reasonable men would not likely enter into, the interpretation which makes a fair, rational and probable contract must be preferred.

*Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 839 P.2d 10, 25 (Haw. 1992) (internal quotation marks and citation omitted).

Again, while the general contract principles cited are not disputed, Acadian's application of those principles is.  The referenced contract provisions are not ambiguous or susceptible to multiple constructions.  Section X clearly obligates Acadian to post collateral immediately upon the occurrence of an event of default, and Section VIII clearly states that Acadian must first post collateral before it can challenge ACIC's good faith.  Acadian's proposed reading simply *ignores* the collateral provisions and credits only the provision it likes, Section III.

Neither are the collateral provisions "inequitable, unusual, or such as reasonable men would not likely enter into."  *See Amfac*, 839 P.2d at 25.  The principal purpose of surety indemnity agreements is to obligate the principal to protect the surety against its exposure from litigation with the obligee that may arise from a Bond claim.  *See Phila. Indem. Ins. Co. v. Ohana Control Sys., Inc.*, 450 F. Supp. 3d 1043, 1054–55 (D. Haw. 2020).  The collateral provisions, which are commonplace in such agreements, further that goal.  *See Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984).  As this District has previously explained:

> Collateral provisions ensure that the surety's investigation into the merits of claims against the bond is not cut short by concerns about the principal's solvency. . . .
>
> [Indemnification provisions and collateral provisions] are [both] constrained by the implied covenant of good faith and fair dealing. . . . But the limits imposed by the duty of good faith and fair dealing reflect the different functions of the two provisions.  Because the surety requests indemnification after investigating an underlying claim and determining that the claim is valid, the duty of good faith and fair dealing permits a surety to request indemnification only if it has reasonably determined that the underlying claim was *actually* valid. . . .
>
> A collateral request, however, is made before an investigation into the validity of the underlying claims concludes.  The principal must post collateral if the surety reasonably believes that a claim against the bond *could possibly* be valid. . . .  Such a demand is reasonable even though the third parties "may ultimately recover only a fraction of what they assert they are owed, or nothing at all."  *RLI Ins. Co. v. Pro-Metal Constr., Inc.*, 2019 WL 1368851 at *4 (S.D.N.Y. 2019). . . .  Of course, a surety cannot request collateral if the underlying claim is patently frivolous.

*Phila. Indem.*, 450 F. Supp. 3d at 1054–55 (citations omitted).

In other words, there is an order and process to these types of agreements.

As soon as a Bond claim was made, Acadian was required (upon demand) to post

collateral to protect ACIC against its potential losses.  If Acadian failed or refused

to do so, then, having left ACIC in the lurch, Acadian could not later claim that

ACIC acted in bad faith towards *it*.[13]  *See Furuya v. Ass'n of Apartment Owners of*

---

[13]Acadian has insinuated that the collateral demand here was not reasonable.  *See* Jarvan Decl. ¶ 18; *Devs. Surety and Indem. Co. v. DKSL, LLC*, 2018 WL 1177918 at *6 (D. Haw. Mar. 6, 2018) (holding that collateral demands must be reasonable or "commensurate with the claims made against the surety").  ACIC's collateral demand was reasonable.  It was consistent with the penal sum of $5,654,330.00—the amount to which Acadian explicitly bound itself upon

*Pacific Monarch, Inc.*, 375 P.3d 150, 164 (Haw. 2016) ("[A] party who breaches…an agreement cannot enforce the agreement to his or her benefit.") (citation omitted).  There is nothing inherently inequitable, unreasonable, or unfair about the contracts that Acadian readily agreed to, all of which enabled its participation in the rail project at issue.

B.    Unconscionability

Alternatively, Acadian contends that the collateral provision is unconscionable or adhesive because it impermissibly grants good faith only to those who can afford it.  Dkt. Nos. 78 at 21, 84 at 10; *see generally Bd. of Dirs. of Ass'n of Apartment Owners of Discovery Bay Condo. v. United Pacific Ins. Co.*, 884 P.2d 1134, 1137 (Haw. 1994) (explaining that a surety always owes a duty of good faith and fair dealing to a principal).  Acadian asserts that the collateral provisions in this case "negated" ACIC's duty of good faith by removing Acadian's ability to enforce it unless Acadian posted collateral in an amount ACIC knew the subcontractor could not afford.  Dkt. Nos. 60-1 at 3, 78 at 21.

In Hawai'i, a contract is unconscionable if it is impermissibly one-sided (substantively unconscionable) and is the result of unfair surprise (procedurally unconscionable).  *Balogh v. Balogh*, 332 P.3d 631, 643 (Haw. 2014).  A contract is

---

contracting—and it was substantially less than the amount Nan demanded on the Bond claim, $7,412,301.92.  Acadian's claim that it could "never" have afforded to deposit this amount, as counsel repeatedly stated in oral argument, does not impeach the demand's reasonableness.

adhesive if it is proffered by the stronger of the contracting parties on a "take it or leave it" basis. *Brown v. KFC Nat'l Mgmt. Co.*, 921 P.2d 146, 167 (Haw. 1996).

Acadian has provided the Court with no examples of how these doctrines are applied in Hawai'i, nor virtually *any* facts from which the Court can analyze the issue in this case. With regard to substantive unconscionability, although the contracts provided discretion to ACIC in naming the collateral sum and settling the Bond claim, Acadian possessed the ability to challenge the claim. This standard surety arrangement is not unjustly disproportionate or one-sided. *See Balogh*, 332 P.3d at 643. Moreover, collateral condition precedent clauses in surety indemnity agreements are routinely enforced in courts across the United States. *See, e.g.*, *Phila. Indem. Ins.*, 450 F. Supp. 3d at 1051 ("Sureties are ordinarily entitled to specific performance of collateral security clauses.") (citing *Devs. Surety and Indem. Co. v. DKSL, LLC*, 2018 WL 1177918 at *5 (Mar. 6, 2018); *U.S. Surety Co. v. Best Constr. Drywall Servs., Inc.*, 2018 WL 2267109 at *2 (M.D. Fla. May 17, 2018) ("[I]f an indemnitor fails to post contractually required collateral, a surety's paying or settling a claim cannot amount to bad faith.") (citing *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 534 F.Supp.2d 1290, 1316 (S.D. Fla. 2008)); *Fid. and Deposit Co. of Md. v. D.M. Ward Constr. Co.*, 2008 WL 2761314 at *3 (D. Kan. July 14, 2008) (collecting cases); *FCCI Ins. Co. v. Marine Tech Servs.*, 2021 WL 3377572 at *4 (S.D. Tex. June 14, 2021).

With regard to procedural unconscionability, Acadian alleges it "had no experience with this type of bond and had no idea that as an SBA bond principal, it would be in for dramatically different treatment than its prior surety experiences." Dkt. No. 78 at 8.  But Acadian does not allege that any of the terms were buried in the contract, unfairly surprising, or even different than its prior surety contracts without the SBA guarantee.  *See Balogh*, 332 P.3d at 643.  On the contrary, Acadian admits that it understood its responsibilities under the GIA and Bond.  *See* Jarvan Decl. ¶ 18 ("When I signed up for the bond, I understood that the bond had liabilities attached to it, but [I] believed that the surety would treat me and my company in good faith and be reasonable.").

With regard to adhesion, Acadian has made no allegation, much less offered facts indicating, that ACIC proffered the surety contracts on a "take it or leave it" basis or otherwise pressured Acadian into signing.  *See Brown*, 921 P.2d at 167.

In short, Acadian has not shown that there is a genuine issue for trial on whether the collateral provisions are unconscionable or adhesive.  *See Soremekun*, 509 F.3d at 984 (requiring a non-movant to provide significant, probative evidence tending to prove its defense in order to survive a motion for summary judgment on which the movant has borne its burden).

**III.    Acadian forfeited its "bad faith" defenses by failing to post collateral.**

There is no genuine dispute of material fact that Acadian failed to post collateral.  DCSF ¶¶ 18, 24; PCSFO ¶¶ 18, 24.  Acadian not only failed to post the penal sum, but it failed to post *anything*, or even to respond to ACIC's demand at all, such as in an attempt to negotiate the amount.  Thus, Acadian is now contractually precluded from challenging ACIC's good faith in settling the Bond claim.

## CONCLUSION

ACIC has shown that no reasonable jury could find for Acadian on any of the essential elements of its breach of contract claim.  Acadian has not shown that there is a genuine issue for trial on any of its affirmative defenses.  Therefore, ACIC's Motion for Summary Judgment, Dkt. No. 59, is GRANTED, and Plaintiff Acadian's Motion for Summary Judgment, Dkt. No. 60, is DENIED.

IT IS SO ORDERED.

DATED: June 15, 2022 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*Acadian Steel, Inc. v. American Contractors Indemnity Company v. Jarvan Piper, et al*; Civil No. 21-00131 DKW-KJM; **ORDER (1) GRANTING DEFENDANT/THIRD-PARTY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIM AGAINST PLAINTIFF AND THIRD-PARTY DEFENDANTS AND (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**